**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ALVINO P.,

          Plaintiff,

    v.

ANDREW M. SAUL,
Acting Commissioner of
Social Security,

          Defendant.

Case No. 19-cv-1484

Magistrate Judge Sunil R. Harjani

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Alvino P.[1] seeks judicial review of the final decision of the Commissioner of

Social Security denying his application for Disability Insurance Benefits.  Alvino asks the Court

to reverse and remand the ALJ's decision, and the Commissioner moves for its affirmance.  For

the reasons set forth below, the ALJ's decision is reversed and this case is remanded for further

proceedings consistent with this Memorandum Opinion and Order.

## I. BACKGROUND

Alvino is a 63 year-old man with a high school education who worked as a school custodian

for nearly twenty years. (R. 44, 45.)  The medical record indicates that Alvino has been diagnosed

with an array of ailments, including chronic renal insufficiency, diabetes mellitus (Type II),

diabetic peripheral neuropathy, gout, hypertension, lumbar spine pain, lumbar facet syndrome,

myofascial pain, obesity, osteoarthritis and pain in both knees, patella-femoral syndrome, and

sleep apnea. *Id.* at 277, 308, 325, 379, 401, 471, 479.  Alvino testified that he lives alone in a first-

---

[1] Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff by
his first name and the first initial of his last name or alternatively, by first name.

floor apartment and that he works part-time as a caretaker for a woman 15 hours a week. *Id.* at 47-52. His tasks as a caretaker involve Alvino preparing food in the microwave, picking up and administering the woman's medicine, doing small amounts of laundry, vacuuming, and driving the woman a short distance to her doctor's appointments. *Id.* After being diagnosed with diabetes in April 2015, Alvino retired in June 2015 due to the pressure of his job. *Id.* at 45-46, 51.

Alvino applied for disability insurance benefits in January 2016, alleging disability beginning June 30, 2015. (R. 176-77). Alvino's claim was initially denied on April 26, 2016, and upon reconsideration on July 22, 2016. *Id.* at 81, 92. Upon Alvino's written request for a hearing, he appeared and testified at a hearing held on January 12, 2018 before ALJ Deborah Giesen. *Id.* at 40-71. At the hearing, the ALJ heard testimony from Alvino and a vocational expert, Linda Tolley. *Id.* at 64-70.

On April 10, 2018, the ALJ issued a decision denying Alvino's application for disability benefits. (R. 34). The opinion followed the required five-step evaluation process. 20 C.F.R. § 404.1520. At step one, the ALJ found that Alvino had not engaged in substantial gainful activity since June 30, 2015, the alleged onset date. *Id.* at 26. At step two, the ALJ found that Alvino had the severe impairments of hypertension, sleep apnea, diabetes, and osteoarthritis of both knees. *Id.* at 26-27. At step three, the ALJ determined that Alvino did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). *Id.* at 27.

The ALJ then concluded that Alvino retained the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. § 404.1567(c), except:

> no working around unprotected heights, open flames or dangerous
> moving machinery; no climbing of ladders/ropes/scaffolds; and

frequent climbing of ramps and stairs and stooping, kneeling, crouching, and crawling.

(R. 27-28). Based on this RFC, the ALJ determined at step four that Alvino could not perform his past relevant work as a janitor. *Id.* at 32. At step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Alvino could perform. *Id.* at 33. Specifically, the ALJ found Alvino could work as a hand packager, dishwasher, or laundry worker. *Id.* Because of this determination, the ALJ found that Alvino was not disabled. *Id.* at 33-34. The Appeals Council denied Alvino's request for review on January 17, 2019, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1; *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018).

## II. DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a

determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Although this standard is generous, it is not entirely uncritical." *Steele*, 290 F.3d at 940. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Id.*

The ALJ found Alvino not disabled at step five of the sequential analysis because he retains the RFC to perform other work that exists in significant numbers in the national economy. Alvino argues that the ALJ failed to properly weigh the medical opinions in forming her RFC opinion that Alvino could perform medium work. Specifically, Alvino argues that the ALJ erred in giving greater weight to the opinions of two state agency medical consultants than the opinions of Dr. Melanie Gordon and Dr. Jorge Saad. Doc. [10] at 10. The Court agrees.[2] Accordingly, for the reasons discussed below, the ALJ's decision must be reversed.

Generally, the regulations favor medical opinions from treating physicians, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). The opinion of a treating physician is therefore entitled to controlling

---

[2] Because the Court remands on this basis, the Court does not address Alvino's other arguments.

weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c)(2); *Kaminski v. Berryhill*, 894 F.3d 870, 874, 874 n.1 (7th Cir. 2018) (for claims filed before March 27, 2017, an ALJ "should give controlling weight to the treating physician's opinion as long as it is supported by medical findings and consistent with substantial evidence in the record.").

Despite the regulations' preference for the opinions of treating physicians, there is no categorical rule prohibiting ALJs from giving greater weight to non-examining state agency physicians. In fact, such decisions are reviewed merely for substantial evidence and are, not infrequently, upheld. *See, e.g.*, *Pytlewski v. Saul*, 791 F. App'x 611 (7th Cir. 2019) (substantial evidence supported ALJ's decision to give more weight to state agency psychologists' opinions where treating physician's second opinion was extreme and entirely incompatible with earlier opinion); *Ketelboeter v. Astrue*, 550 F.3d 620 (7th Cir. 2008) (substantial evidence supported ALJ's decision to give greater weight to state agency doctor's opinions than that of treating physician where record contained little objective evidence supporting alleged severity of symptoms and treating physician's opinion was based almost entirely on claimant's subjective complaints and was internally inconsistent).

That being said, the Seventh Circuit has held that substantial evidence does not support an ALJ's decision to give greater weight to non-examining state agency physicians who have not reviewed medical records relevant to determining a claimant's functional limitations. *See*, *e.g.*, *Thomas v. Colvin*, 826 F.3d 953 (7th Cir. 2016) (ALJ's uncritical acceptance of state agency doctors' conclusions over that of treating physician's opinion was not supported by substantial evidence where state agency physicians did not examine claimant and did not review later

treatment records diagnosing claimant with fibromyalgia and degenerative changes in shoulder); *see also Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) (citations omitted) ("The ALJ instead gave 'significant weight' to the agency consultants' opinions, but these consultants did not examine Meuser, they are not psychiatrists (though one was a psychologist), and they had reviewed only a fraction of Meuser's treatment records that were available before Meuser submitted additional evidence."); *Hoyt v. Colvin*, 553 F. App'x 625, 627-28 (7th Cir. 2014) (holding ALJ could not solely rely on state agency physicians where state agency physicians never examined claimant or reviewed results of EMG or MRI tests and where their dated opinions could not account for how claimant's condition might have deteriorated). The Seventh Circuit has further held that "ALJs may not rely on outdated opinions of agency consultants if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) (internal quotation marks and citations omitted).

In this case, the two state agency physicians only had access to Alvino's medical records through July 21, 2016. (R. 79, 91). As a result, the state agency physicians did not review several of his medical records, including the August 2016 MRI of Alvino's lumbar spine, Dr. Gordon's November 2016 medical source statement, Dr. Saad's March 2017 opinion that Alvino should avoid bending, lifting, and stairs, and the April 2017 pain clinic records of Dr. Rahman. *Id.* at 407-14, 443-44, 471, 473-84. The state agency physicians accordingly missed Alvino's diagnoses of patella-femoral syndrome, lumbar facet syndrome, and myofascial pain, which were formed by Alvino's doctors after July 21, 2016. *Id.* at 471, 479.

While it is common for there to be some lag between the state agency physicians' review and the ALJ's decision, here, the delay meant that the state agency physicians did not review some

of the medical evidence most crucial to understanding Alvino's functional capabilities. For instance, the August 2016 MRI of Alvino's lumbar spine that the state agency physicians did not review was interpreted by Dr. Kalyaniwalla as indicating degenerative disc disease: "Mild multilevel degenerative disc disease with disc bulges at L3-4, L4-L5 and L5-S1 without significant spinal canal stenosis at these levels. No acute fracture." (R. 444). Dr. Gordon, who ordered the August 2016 MRI, later concluded in her November 2016 medical source statement—also not reviewed by the state agency physicians—that Alvino had an "inability to bend or stoop," that he should not engage in manual labor, that he should never lift 20 pounds or 50 pounds in a competitive work situation, and that he would "have [a] difficult time [with] manual labor [and] would have [a] restriction with lifting." *Id.* at 407-09, 413, 443. The state agency physicians also missed Dr. Saad's March 30, 2017 treatment record, in which Dr. Saad significantly ordered imaging of Alvino's left knee, conducted a physical examination of Alvino, reviewed Alvino's August 12, 2016 lumbar spine MRI, diagnosed Alvino with patella-femoral syndrome and pain of lumbar spine, and included in his plans for Alvino that he rest his knee, avoid stairs, avoid bending and lifting, and keep his appointment with the pain clinic. *Id.* at 461-472. A month later, at Alvino's pain clinic appointment with Dr. Rahman, Dr. Rahman reviewed imaging of Alvino's lumbar spine and left knee; diagnosed Alvino with lumbar facet syndrome, myofascial pain, left knee pain, and chronic low back pain; ordered physical therapy; and called in an appointment for Alvino to receive a lumbar facet injection. *Id.* at 473-80. Because the state agency physicians' review was completed by July 2016, their RFC determinations were not informed by all of the preceding medical records pertinent to Alvino's functional limitations.

The ALJ nevertheless gave "some weight" to the state agency physicians' opinions indicating that Alvino could perform medium work, while only assigning "little weight" to Dr.

Gordon's opinion. (R. 31-32). The ALJ did not even mention Dr. Saad, let alone discuss Dr. Saad's instructions that Alvino rest his knee, avoid stairs, avoid bending, and avoid lifting. According to the ALJ, the state agency physicians' respective opinions that Alvino has the physical RFC to "lift and/or carry 50 pounds occasionally and 25 pounds frequently, to stand and/or walk about 6 hours in an 8-hour workday subject to no more than occasionally climbing of ramps/stairs and ladders/ropes/scaffolds, stooping, kneeling, crouching and crawling" and "lift and/or carry 50 pounds occasionally and 25 pounds frequently, to stand and/or walk about 6 hours in an 8-hour workday subject to no more than occasionally climbing ladders/ropes/scaffolds and frequently kneeling, crouching, and crawling" were entitled to some weight because the opinions were "supported by the objective evidence of record and the claimant's course of treatment." *Id.* at 31. Yet the state agency physicians' RFC opinions appear to be contradicted by the subsequent medical records (that the state agency physicians did not review) indicating that Alvino's condition was degenerative, particularly the August 2016 MRI[3] and subsequent diagnoses by Alvino's doctors that he suffered from patella-femoral syndrome, lumbar facet syndrome, myofascial pain, left knee pain, and chronic low back pain.

Moreover, the state agency physicians' RFC opinions were inconsistent with some of the medical records they did review. Perhaps most strikingly, the state agency physicians' opinions were not supported by significant findings resulting from a consultative examination ordered by the agency and conducted on July 7, 2016. The consultative examiner, Dr. Ryu, reviewed Alvino's medical record and spent 40 minutes with Alvino. (R. 400). With respect to daily activities, Alvino told Dr. Ryu that he was able to bathe, dress, cook, grocery shop, travel, pay bills, sit, stand, and

---

[3] The state agency physicians' RFC reports provide additional evidence that the August 2016 MRI could have impacted their conclusions. Each state agency physician cited an earlier April 2016 MRI which did not show degenerative disc disease as support for their opinions that Alvino could perform medium work. (*See* R. 76-77, 78, 88, 89, 512).

walk, but that he could not carry heavy objects. *Id.* at 401. Alvino further reported that he could vacuum, make his bed, wash dishes, wash floors, and wash clothes, but that he could not iron clothes or take out the garbage. *Id.* Dr. Ryu observed Alvino generally as "an obese male" who was "in no acute distress" and who "was able to move around without any difficulty." *Id.* Dr. Ryu took Alvino's vitals and conducted a physical examination of Alvino. *Id.* at 402-04. Dr. Ryu's musculoskeletal examination of Alvino revealed that he had full range of motion in his lower extremities, cervical spine, thoracic spine, and lumbar spine, but that he had tenderness in the lumbar spine with positive straight leg raising on the left and the right sides. *Id.* at 403. In examining Alvino's gait, Dr. Ryu observed that Alvino had no difficulty sitting and standing, that he had mild difficulty getting on and off the examination table, and that he had moderate difficulty heel walking and with tandem gait. *Id.* Alvino was unable to do toe walking, squatting and rising, and weightbearing and single leg balance. *Id.* After completing the physical examination, Dr. Ryu's clinical impressions listed the following problems: diabetes mellitus, gout, obstructive sleep apnea, severe low back pain, poor vision due to chronic diabetes mellitus, hypertension, and status post left hand tendon repair. *Id.* at 404. At the very least, Dr. Ryu's examination revealed Alvino's lower back pain and struggles with squatting, rising, and balance. Despite Dr. Ryu's findings, Dr. Blinsky, the state agency physician reviewing Alvino's record on reconsideration, nevertheless found that Alvino could occasionally lift 50 pounds, frequently lift 25 pounds, that he had an unlimited ability to stoop and balance, and that he could frequently kneel, crouch, and crawl. *Id.* at 88.

The state agency physicians' opinions were similarly inconsistent with Alvino's pre-July 2016 physical therapy records. During Alvino's initial evaluation appointment in May 2016, Physical Therapist Meena Renganathan's objective testing showed that Alvino had various trunk

deviations, including decreased lumbar lordosis, and that Alvino had issues with knee flexion in both knees. (R. 376). Alvino further tested positive on both sides in his straight leg raising tests, could not balance on one limb without upper extremity support, and was unable to complete 5 sits-to-stands. *Id.* at 377-79. In her analysis, the physical therapist concluded that Alvino had several impairments, including decreased tissue mobility in trunk and lower extremities, impaired balance, decreased lumbar lordosis, pain, and muscle guarding. *Id.* at 379. She further noted that Alvino's BMI was "also likely a contributing factor to increased stress and pain in back." *Id.* at 379. Later physical therapy records, although they did not contain the full range of testing, consistently reflected Alvino's pain. For instance, a June 2016 physical therapy note stated that Alvino "[d]emonstrates significant muscle guarding and reluctance to move," and that Alvino was educated "regarding lumbar paraspinal muscle tightness and core musculature weakness as contributing factors to low back pain." *Id.* at 394. Alvino's physical therapy records noting his pain, inability to balance, and objective testing showing lumbar restrictions are thus at odds with the state agency physicians' determination that Alvino can perform medium work, which requires "considerable lifting" and "frequent bending-stooping." SSR 83-10 at * 6 (S.S.A. 1983).

In addition to the state agency physicians' review missing important medical records and being inconsistent with some of the medical records the state agency physicians did have access to, the ALJ favored those opinions while giving short shrift to Dr. Saad and Dr. Gordon, Alvino's treating physician.

The ALJ weighed Dr. Gordon's medical source statement from November 15, 2016 and assigned it little weight. (R. 31-32). In her analysis on Dr. Gordon, the ALJ acknowledged Dr. Gordon's statement that she had treated Alvino for diabetes, gout, hypertension, and osteoarthritis beginning April 2, 2016. *Id.* at 31. The ALJ then summarized Dr. Gordon's opinion as follows:

> Dr. Gordon indicated the claimant's symptoms could interfere with his attention and concentration up to 50% of the day. Dr. Gordon also indicated the claimant "sometimes" had the ability to ambulate effectively unassisted but did not specify how frequent "sometimes" is. Dr. Gordon also indicated the claimant's symptoms would interfere making him unable to maintain persistence and pace to engage in competitive employment. Finally, Dr. Gordon indicated the claimant has the capacity for sedentary work, standing/walking no more than two hours in an 8-hour day.

*Id.* Next, the ALJ stated that she assigned Dr. Gordon's opinion little weight "because it was not consistent with the treatment records." *Id.* at 31-32. The ALJ additionally discounted Dr. Gordon's opinion because she found it "contradictory [because it] indicated at one point [that] the claimant would be unable to maintain persistence and pace but at another point indicated the claimant would need one additional 15 minute break during the day." *Id.* The ALJ further noted that Dr. Gordon "only saw the claimant two or three times in 2016 . . . ." *Id.* Finally, the ALJ stated that Dr. Gordon's opinion was "not consistent with the rest of the objective medical evidence of record." *Id.*

With respect to Dr. Saad, the ALJ mentioned two treatment records involving Dr. Saad earlier in her RFC analysis, but failed to discuss or weigh Dr. Saad's opinions. (R. 30).

Alvino argues that the ALJ failed to weigh Dr. Gordon's medical source statement with the treating physician regulatory factors, found in 20 C.F.R. § 404.1527. Doc. [10] at 9. Alvino also takes issue with the reasons the ALJ provided for discounting Dr. Gordon's opinion, such as the ALJ's characterizations of Dr. Gordon's opinion as inconsistent and her treatment relationship with Alvino as limited. Doc. [10] at 9; Doc. [19] at 3 n.2.

When evaluating a claimant's medical record, an ALJ "is required to determine which treating and examining doctors' opinions should receive weight and must explain the reasons for that finding." *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1527(d),

(f)).  The regulations require that each medical opinion presented in the record be weighed.  *See* 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").  Additionally, an ALJ must "offer good reasons for discounting a treating physician's opinion." *Campbell*, 627 F.3d at 306 (internal quotation marks and citations omitted); *see also Walker v. Berryhill*, 900 F.3d 479, 485 (7th Cir. 2018).  Those reasons must be "supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citation omitted); *see* 20 C.F.R. § 404.1527(c).

Because the ALJ did not give controlling weight to Dr. Gordon's opinion, the ALJ had to consider the length, nature, and extent of the treatment relationship, the frequency of examination, Dr. Gordon's specialty, the types of tests performed, and the consistency and supportability of Dr. Gordon's opinions. *Moss*, 555 F.3d at 561.  Beginning with specialty, the ALJ did not mention that Dr. Gordon's area of specialty is internal medicine, so the ALJ failed to minimally address the factor of specialty. (R. 414).

The ALJ likewise failed to address the supportability of Dr. Gordon's opinion.  The regulations explain that supportability encompasses the preference given to a medical source that "presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings . . . ." 20 CFR § 404.1527(c)(3).  In Dr. Gordon's medical source statement, she was asked to "identify [ ] clinical findings and objective signs of the conditions that have [been] diagnosed."

(R. 407). Dr. Gordon responded by listing Alvino's "inability to bend or stoop" and included a note about "pain [from] lying down or [from being] on feet for extended periods of time." *Id.* Because the ALJ did not discuss this response, or any objective signs or laboratory findings presented (or not presented) by Dr. Gordon, the Court cannot find that the ALJ addressed the supportability of Dr. Gordon's opinions.[4]

The ALJ did consider the length and frequency of Dr. Gordon's treating relationship with Alvino, however. The regulation recognizes this factor's importance as to the weight of a treating source's medical opinion. Under 20 CFR § 404.1527(c)(2)(i), "[g]enerally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." And that whenever "the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source." *Id.* The ALJ began her analysis of Dr. Gordon by stating Dr. Gordon provided a medical source statement on November 15, 2016. (R. 31). Then the ALJ acknowledged Dr. Gordon's indication that she began treating Alvino on April 2, 2016. *Id.* In discounting Dr. Gordon's opinion, the ALJ specifically noted that "Dr. Gordon only saw the claimant two or three times in 2016 . . . ." *Id.* at 32. The ALJ accordingly addressed the length and frequency treating physician factors.

The ALJ touched on the nature and extent of Dr. Gordon's treatment relationship. Under 20 CFR § 404.1527(c)(2)(ii), the ALJ "will look at" the treatment that the treating source provided

---

[4] The Court acknowledges that the ALJ used the word "support" in the following statement about Dr. Gordon's opinion: "her treatment records do not support the limitations identified." (R. 32). However, that statement does not address the objective signs Dr. Gordon presented in her medical source statement, nor the explanation Dr. Gordon provided for her opinion. *See* 20 CFR § 404.1527(c)(3). Therefore, in the Court's view, as discussed below, the ALJ's statement about Dr. Gordon's treatment records is conclusory and lacks any detail where this Court can engage in a meaningful review.

and the type of examinations and testing that the treating source has performed or ordered from specialists. The regulation explains by example that an ophthalmologist who merely *notices* neck pain during eye examinations will be given less weight than that of another physician who actually treated the patient's neck pain. *Id.* Here, the ALJ stated simply that "Dr. Gordon indicated she treated the claimant for diabetes, gout, hypertension and osteoarthritis . . . ." (R. 31). While the ALJ in this case mentioned some of the conditions that Dr. Gordon was treating Alvino for—Dr. Gordon was also treating Alvino's back pain, which the ALJ failed to mention—the ALJ did not discuss the types of techniques used by Dr. Gordon. The ALJ did not comment on the lab work or radiology tests that Dr. Gordon ordered and reviewed when weighing her opinion, which included the August 2016 MRI of the lumbar spine showing degenerative disc disease. *Id.* at 371-73, 389-90, 435, 443-44. Nor did the ALJ mention the prescriptions Dr. Gordon ordered filled, or the physical examinations she conducted as part of Alvino's treatment. *See id.* at 364-370, 435-41, 448-53, 454-60. The ALJ's consideration of the nature and extent of Dr. Gordon's treatment of Alvino, while present, was scant.

The ALJ's treatment of the consistency of Dr. Gordon's records was similarly incomplete. Consistency is directed at the fit of the medical source's opinion in the context of the record as a whole. 20 CFR § 404.1527(c)(4). The ALJ stated that she gave Dr. Gordon's opinion little weight because "it was not consistent with the treatment records." (R. 31-32). In addition, the ALJ stated that Dr. Gordon's treatment records did not support Dr. Gordon's opinion, and that her opinion was "not consistent with the rest of the objective medical evidence of record." *Id.* at 32. Aside from those conclusory statements about consistency, however, the ALJ does not provide further explanation. That is, the ALJ does not explain how Dr. Gordon's opinion is inconsistent with the

rest of the record. As a result, the ALJ's addressing of the consistency treatment factor is unsupported as well.

The Commissioner argues that the ALJ "considered a number of the regulatory factors," including "Dr. Gordon's short and infrequent treatment history" and internal inconsistencies in Dr. Gordon's opinion. Doc. [18] at 3-4. Additionally, the Commissioner asserts that the ALJ "considered the treatment records and the objective medical evidence of record, and found that they were inconsistent with and did not support Dr. Gordon's opinion, as required by the regulations." *Id.* at 4. According to the Commissioner, the ALJ did not need to explicitly discuss and weigh each factor. *Id.* (citing *Collins v. Berryhill*, 743 F. App'x 21, 25 (7th Cir. 2018)). While the Court agrees that the ALJ did at least mention the timing of Dr. Gordon's treatment relationship with Alvino, the rest of the Commissioner's arguments do not hold water.

To begin, the Commissioner's claim that the ALJ noted internal consistencies is not persuasive. The Commissioner states that the ALJ was noting internal inconsistencies when the ALJ made the following statements about Dr. Gordon's opinion: "Dr. Gordon also indicated the claimant 'sometimes' had the ability to ambulate effectively unassisted but did not specify how frequent 'sometimes' is" and "Additionally, the opinion was contradictory and indicated at one point, the claimant would be unable to maintain persistence and pace but at another point indicated the claimant would need one additional 15 minute break during the day." Doc. [18] at 3; (*see* R. 31, 32). The Commissioner's first claimed internal inconsistency runs afoul of the *Chenery* doctrine because the ALJ did not state that the "sometimes" language was internally inconsistent. The Commissioner cannot defend the ALJ's decision on grounds that the ALJ did not herself embrace. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir.2010). Also, as will be discussed further below, the Court questions whether the

second alleged internal inconsistency is actually inconsistent. Moreover, the Court is not convinced that the identification of internal inconsistencies satisfies the consistency prong of the treating physician analysis anyway because such an identification is not really considering a medical opinion "with the record as a whole." *See* 20 CFR § 404.1527(c)(4). Hence, the Court is not swayed by the Commissioner's internal inconsistencies argument.

Turning to the Commissioner's argument that the ALJ "considered the treatment records and the objective medical evidence of record, and found that they were inconsistent with and did not support Dr. Gordon's opinion," the Court is dubious. If an ALJ discounts a treating physician for inconsistencies, she must explain those inconsistencies with enough detail for the reviewing court to understand why the ALJ found the opinion inconsistent with the record. *See Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013); *Frobes v. Barnhart*, 467 F. Supp. 2d 808, 819 (N.D. Ill. 2006). Here, the ALJ failed to explain the purported inconsistencies in Dr. Gordon's opinion. Admittedly, the ALJ did discuss Dr. Gordon's treatment records elsewhere in her analysis. (*See, e.g.*, R. 29.) It is also true that the ALJ, again elsewhere in her opinion, discussed objective medical evidence in the record. *See id.* at 27-30. However, the ALJ did not point to any specifics from Dr. Gordon's treatment records or the other objective medical evidence in weighing Dr. Gordon's opinion; nor did she explain how those records were inconsistent with Dr. Gordon's opinion. The Court therefore doubts that the ALJ's boilerplate statements about inconsistency suffice.

As to the Commissioner's claim that the ALJ did not need to explicitly weigh each factor, the law is not as simple as the Commissioner claims. One colleague in the Northern District has noted that ALJs' frequent failure to apply the treating physician checklist "has resulted in two distinct—and difficult to reconcile—lines of cases in the Seventh Circuit." *Duran v. Colvin*,

No. 13 CV 50316, 2015 WL 4640877, at *8 (N.D. Ill. Aug. 4, 2015). Under the more lenient line

of cases, discussion of even just two of the treating physician factors satisfies the treating physician

rule, *see Elder v. Astrue*, 529 F.3d 408 (7th Cir.2008), and an ALJ need only "sufficiently account[]

for" the treating physician factors. *Schreiber v. Colvin*, 519 Fed. Appx. 951, 959 (7th Cir.2013).

*See also Collins v. Berryhill*, 743 F. App'x 21, 25 (7th Cir. 2018), *reh'g denied* (Sept. 24, 2018),

*cert. denied*, 139 S. Ct. 1209, 203 L. Ed. 2d 233 (2019) (ALJ satisfied checklist by considering the

length of the treatment relationship, frequency of examination, supportability, and consistency).

In the more stringent line of cases, the ALJ is required to explicitly address the checklist factors.

*See Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010); *Rainey v. Berryhill*, 731 Fed. Appx.

519, 523 (7th Cir. 2018). Fortunately, the Court need not determine which line of cases controls

here because even if the ALJ had satisfied the treating physician factor checklist, her reasons for

discounting Dr. Gordon's opinions were not "good reasons." *Campbell*, 627 F.3d at 306.

The ALJ provided three reasons for discounting Dr. Gordon's opinion: (1) her opinion was

not consistent with the treatment records and the rest of the objective medical evidence of record;

(2) Dr. Gordon's opinion was "contradictory"; and (3) "Dr. Gordon only saw the claimant two to

three times in 2016 . . . ." (R. 31-32). In this case, not one of these reasons constitutes a good

reason for discounting Dr. Gordon's opinions.

Beginning with the ALJ's conclusion that Dr. Gordon's opinion was inconsistent with her

treatment records and the other medical evidence in the record, that reason is problematic in at

least two respects. First, as Alvino argues, the ALJ asserted that Dr. Gordon's opinions were

inconsistent with the record without explaining those inconsistencies. Doc. [10] at 8-9. Those

statements are therefore conclusions, not reasons, let alone good reasons. *See Mueller v. Astrue*,

493 F. App'x 772, 776 (7th Cir. 2012) (one-sentence declaration that treating physician's opinion

was inconsistent with daily activities, objective medical evidence, observations and opinions of other doctors, and claimant's ability to perform work in the past did not meet the "good reasons" standard for discounting a treating physician because it was "a conclusion, not a reason (or reasons)"). Second, it is not apparent how Dr. Gordon's opinion is inconsistent with her treatment records or the other objective medical evidence in the record.

Rather, the record appears to support Dr. Gordon's opinion that Alvino should not work a manual labor job. As an example, it was Dr. Gordon who ordered the August 2016 MRI scan of Alvino's lumbar spine. (R. 443-44). In a subsequent treatment record from November 8, 2016, one week before Dr. Gordon completed her medical source statement, Dr. Gordon performed a physical examination which revealed Alvino had a limited range of motion in the lower extremities due to Alvino's pain. *Id.* at 451. Dr. Gordon also observed that Alvino was unable to bend or stoop at knee, that his gait was slow and steady, and that he had "pain with palpation of the back in the paraspinal areas." *Id.* In the impression and plan portion of the treatment record, Dr. Gordon referred to the August 2016 MRI and interpreted the MRI as showing multilevel degenerative joint disease. *Id.* at 453. Dr. Gordon's contemporaneous treatment record showing Alvino's limited range of motion, pain, and degenerative joint disease diagnosis therefore supports, rather than undercuts, Dr. Gordon's opinion that Alvino would "have [a] difficult time [with] manual labor [and] would have [a] restriction with lifting." *Id.* at 413. Other objective medical evidence supports Dr. Gordon's opinion as well, such as Alvino's physical therapy records reflecting Alvino's positive straight leg raising tests, decreased lumbar lordosis, and knee flexion in both knees, *id.* at 376-77, as well as findings that Alvino's lumbar range of motion is restricted to 45-50 degrees, when 90 degrees is normal. *See id.* at 341-42, 477. Simply put, the record appears to support Dr. Gordon's opinion. Without further elaboration by the ALJ as to what the inconsistencies are with

Dr. Gordon's opinion, the Court is at a loss as to how Dr. Gordon's opinion is inconsistent with other medical evidence in the record.[5] Inconsistency is accordingly not a "good reason" to discount Dr. Gordon's opinion in this case.

The ALJ also explained that she discounted Dr. Gordon's opinion because Dr. Gordon's opinion was "contradictory in nature." (R. 32). Specifically, the ALJ stated: "the opinion was contradictory and indicated at one point, the claimant would be unable to maintain persistence and pace but at another point indicated the claimant would need one additional 15 minute break during the day." *Id.* In the second page of the medical source statement filled out by Dr. Gordon, she opined that Alvino's symptoms would "interfere to the extent that [Alvino] is unable to maintain persistence and pace to engage in competitive employment," but that Alvino could perform sedentary work, which was described in the questionnaire as "lifting up to 10 lbs. occasionally, lifting and carrying small items, standing/walking no more than two hours in an eight-hour day." *Id.* at 408. On the next page, Dr. Gordon was asked "In an eight-hour work day, would this patient require breaks or rest periods in addition to the standard two breaks and lunch break," to which she responded affirmatively, indicating that Alvino would require an additional fifteen-minute break. *Id.* at 409. The ALJ concluded that those two findings were "contradictory in nature," without further explanation. *Id.* at 32.

---

[5] Even though the potential inconsistency was not raised by the ALJ or the Commissioner, the Court did consider whether the state agency physicians' opinions were inconsistent with Dr. Gordon's opinion. Certainly, Dr. Gordon's opinion was more restrictive than the state agency physicians' opinions, but those opinions were made before the August 2016 MRI and before the majority of Dr. Gordon's treatment records. Moreover, Dr. Gordon found Alvino's joint disease to be degenerative. (R. 453). It is not necessarily inconsistent that a later record would find that Alvino's condition had worsened. The Court also considered whether the ALJ's earlier analysis regarding Alvino's lumbar spine impairment as non-severe highlighted any inconsistencies with Dr. Gordon's opinion. *See id.* at 27. However, because the ALJ's lumbar spine analysis is riddled with problems, including the ALJ's playing doctor in interpreting the August 2016 MRI and the ALJ's making unsupported assumptions regarding Alvino's compliance with physical therapy and steroid injections, the Court does not find the ALJ's analysis to identify inconsistencies with Dr. Gordon's opinion.

The Court finds the ALJ's analysis troubling. To begin with, it is not readily apparent how an opinion that somebody would need an additional break is inconsistent with a finding that somebody would be "unable to maintain persistence and pace." More importantly, though, the ALJ had to explain that inconsistency because it is not clear from the record, and because law in this Circuit shows that additional breaks may be consistent with the inability to maintain persistence and pace. *See, e.g.*, *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015) (finding medical evidence in the record demonstrated claimant's moderate difficulties in maintaining persistence and pace, including doctor's assessment that claimant would have a moderate difficulty "performing at a consistent pace without an unreasonable number and length of rest periods"); *Kasberger v. Astrue*, No. 06-3868, 2007 WL 1849450, at *3 (7th Cir. June 27, 2007) (holding ALJ's RFC reflected limitations as to concentration, persistence, or pace in part by allowing claimant to take short breaks to compose himself); *Aguilera v. Colvin*, No. 13-C-1248, 2014 WL 3530763, at *27 (E.D. Wis. July 15, 2014) (holding ALJ's hypothetical question and RFC sufficiently included limitations related to persistence and/or pace where ALJ limited claimant to low stress work with up to 10% off-task time in addition to regular breaks).

Furthermore, several of Dr. Gordon's other answers are consistent with her opinion that Alvino would be unable to maintain persistence and pace and would require an additional break. For one, Dr. Gordon noted that Alvino's pain, symptoms, or medication side effects are severe enough to interfere with his attention and concentration "often (up to 50% of the day)." *Id.* at 407. Dr. Gordon further opined that Alvino may need to lie down or recline periodically throughout the day to relieve or reduce his symptoms. *Id.* at 409. Finally, Dr. Gordon stated that his fatigue could cause a slight impairment to his ability to work. *Id.* at 409. The Court therefore does not find Dr.

Gordon's opinion that Alvino would be unable to maintain persistence or pace to be "contradictory" with his need for an additional fifteen minute break.

In examining Dr. Gordon's medical source statement for other possible internal inconsistencies, the Court finds that, at most, there is a tension (not mentioned by the ALJ) between Dr. Gordon's early answer that Alvino can perform sedentary work and her later answer that Alvino can only sit for 4 total hours in an eight-hour day. (*See* R. 408, 411). Yet that tension is easily understood. Dr. Gordon is a medical professional, not a legal expert on social security law. Nor is she a vocational expert. Further, the only definition of sedentary provided in the worksheet said only that a person working a sedentary job would lift up to 10 lbs. occasionally, lift and carry small items, and stand/walk no more than two hours in an eight-hour day. *Id.* at 408. It said nothing about the required total time of sitting. Additionally, Dr. Gordon answered that Alvino could perform sedentary work but also checked the box for an inability to maintain persistence or pace, which could mean Dr. Gordon had doubts about Alvino's ability to sustain full time sedentary work. *Id.* at 408. Regardless, the ALJ only mentioned one inconsistency—one that does not appear inconsistent—and the Court finds Dr. Gordon's opinion to be otherwise consistent. As a result, consistency is not a "good reason" to discount Dr. Gordon's opinion either.

The ALJ's final reason for discounting Dr. Gordon's opinion was the ALJ's belief that Dr. Gordon only saw Alvino two to three times in 2016, implying a limited treatment relationship. As an initial matter, the ALJ is wrong about the timing of Dr. Gordon's relationship with Alvino. Dr. Gordon's relationship with Alvino was not limited to 2016. Instead, Dr. Gordon was Alvino's physician from April 2016 to early 2017, when Dr. Gordon left the hospital and Dr. Saad took over Alvino's care. (R. 53-54, 364-370, 434-41, 448-53, 454-60). The ALJ was also wrong about the quantity of encounters between Alvino and Dr. Gordon. Dr. Gordon treated Alvino in person

approximately every three months on at least four occasions: in April 2016, July 2016, November 2016, and January 2017. *Id.* at 364-370, 434-41, 448-53, 454-60. Dr. Gordon's treatment of Alvino, moreover, was not limited to those four in-person visits. The record demonstrates that Dr. Gordon ordered and reviewed radiology tests and lab work, managed Alvino's medications, and referred Alvino to a pain clinic. *Id.* at 371-73, 389-90, 435, 443-44, 453. In this case, Dr. Gordon's treating relationship with Alvino was far more extensive than the ALJ recognized. As a result, the Court finds that the extent of Dr. Gordon's treating relationship with Alvino failed to constitute a "good reason" for discounting Dr. Gordon's opinion.

In sum, the ALJ's treating physician analysis of Dr. Gordon was lacking. Even if the ALJ satisfied the treating physician factors with her sparse analysis, she did not provide "good reasons" for discounting Dr. Gordon's opinion. Instead, the ALJ favored the opinions of the state agency physicians, whose review missed records critical to understanding Alvino's functional capabilities. Importantly, those missed records direct a lesser RFC than that of medium work. This is sufficient for a remand.

However, the Court has at least one other concern with the ALJ's weighing of the medical opinions in this case. The ALJ failed to weigh Dr. Saad's March 30, 2017 opinion that Alvino should avoid bending, lifting, and stairs due to his lumbar spine pain and patella-femoral syndrome. (R. 471). The Commissioner argues that Alvino only cites one visit with Dr. Saad, and that Dr. Saad could not have gained treating physician status with a single examination. Doc. [18] at 4. It is true that Dr. Saad gave his opinion with lifting, bending, and stairs restrictions to Alvino after only one visit, although, it was a visit that involved, at a minimum, a review of the August 2016 MRI indicating degenerative disc disease, imaging of Alvino's knee, and a physical examination. (R. 461-72). On the other hand, as Alvino testified, it appears Dr. Saad replaced Dr.

Gordon as Alvino's primary doctor. *Id.* at 53-54. The medical record further confirms that Dr. Saad treated Alvino from at least March 2017 to November 2017. *See id.* at 461-72, 500-510. So, it seems likely that Dr. Saad eventually gained treating physician status. *See* 20 C.F.R. § 404.1527(a)(2) (A "[t]reating source . . . has, or has had, an ongoing treatment relationship with you."). Regardless, even if Dr. Saad's March 30, 2017 opinion was from a non-treating source, it was still a medical opinion that should have been weighed by the ALJ in this case. *See* 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").

The Commissioner characterizes Dr. Saad's opinion as a "recommend[ation] that plaintiff avoid bending and lifting," arguing that "[t]here is no indication that this was a long-term functional limitation, as opposed to a short-term discharge instruction . . . ." Doc. [18] at 5.[6] The Court disagrees. Dr. Saad's conclusion that Alvino avoid bending and lifting meets the definition of a medical opinion under the regulations. *See* 20 C.F.R. § 404.1527(a)(1) ("Medical opinions. Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."). That is, Dr. Saad's bending, lifting, and stairs restrictions comes from a doctor, an acceptable medical source, and his statement reflected a judgment about the severity of Alvino's lumbar spine pain, in that his conclusion was listed as a diagnosis and specified two physical restrictions based on

---

[6] In support of this argument, the Commissioner cites *McFadden v. Berryhill*, 721 F. App'x 501, 503 (7th Cir. 2018). Doc. [18] at 5. But that case is easily distinguishable. In *McFadden*, the doctor's instruction for the claimant to elevate his legs was the only evidence in the record that the claimant needed to elevate his legs, and the instructions were clearly directed at helping the claimant recover from varicose vein surgery. 721 F. App'x at 506. Here, Alvino testified and reported to doctors that he could not lift heavy objects. (R. 53, 401). Alvino's doctors, moreover, confirmed that Alvino could not bend or stoop. *See, e.g., id.* at 451, 471. The record also includes evidence of Alvino's knee problems. *See, e.g., id.* at 467, 477. Indeed, even the ALJ found Alvino's osteoarthritis in both knees to be a severe impairment. *Id.* at 26. As a result, *McFadden* is inapposite to this case.

that diagnosis. (R. 471). Dr. Saad's stairs restriction, too, was based on his diagnosis that Alvino suffers from patella-femoral syndrome. *Id.* Perhaps the Commissioner is right that the opinion should have been given lesser weight due to the timing of Dr. Saad's opinion, or the Commissioner's belief that the opinion was meant only as a recommendation. But the ALJ nevertheless had to weigh the medical opinion because it fits the definition of a medical opinion under the regulations, and because it was evidence that directly contradicted the ALJ's RFC. *See Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (citation omitted) ("[A]n ALJ may not ignore evidence that undercuts her conclusion.").

Bringing it all together, the ALJ erred in her weighing of the medical opinions in this case. The ALJ gave greater weight to state agency physicians' than the opinion of Alvino's treating physician, Dr. Gordon, even though the state agency physicians' review was missing important records, such as the August 2016 MRI of Alvino's lumbar spine. The ALJ's application of the treating physician checklist to Dr. Gordon, moreover, was seemingly deficient. Even if the ALJ satisfied the treating physician checklist, she discounted Dr. Gordon's opinion without providing "good reasons" for doing so. Finally, the ALJ failed to weigh the medical opinion of Dr. Saad, who relevantly concluded that Alvino should avoid bending, lifting, and stairs in light of his lumbar spine pain and patella-femoral syndrome.

The ALJ's error in weighing the medical evidence was not harmless. The ALJ gave greater weight to the state agency physicians, who opined that Alvino could conduct medium work. (R. 31). Dr. Gordon and Dr. Saad's opinions, by contrast, indicate that Alvino would have restrictions in bending, lifting, and standing that would not make him suited for medium work. *Id.* at 407-16, 471. Thus, had the ALJ given greater weight to Dr. Gordon's and Dr. Saad's opinions than that of the state agency physicians, the ALJ would not have been able to construct an RFC

for medium work. Alvino asserts that due to his age, the ALJ would have been required to find Alvino disabled under the regulations if the ALJ had found that Alvino lacked the RFC for medium work. Doc. [10] at 7 (citing 20 C.F.R. Pt. 404, Subpt. P., App. 2, Rules 201.04 (Table No. 1) and 202.04 (Table No. 2)). The Commissioner does not dispute this. The ALJ's error in weighing the medical opinions was consequently not harmless. Even if Alvino's reading of the age tables were incorrect, the error was still not harmless because the ALJ constructed an RFC that did not include the limitations opined by Dr. Gordon and Dr. Saad. *See Lambert*, 896 F.3d at 776.

On remand, the ALJ must reweigh the medical opinions in the record. If she does not give controlling weight to Dr. Gordon's opinion, she must carefully apply the treating physician checklist under 20 C.F.R. § 404.1527 and provide "good reasons" for discounting her opinion. The ALJ must also weigh Dr. Saad's opinion that Alvino avoid bending, lifting, and stairs. In addition, although the Court did not focus on the issue, the Court notes that it seems that the ALJ did not explicitly address several conditions Alvino was diagnosed with, including chronic renal insufficiency, diabetic peripheral neuropathy, lumbar facet syndrome, myofascial pain, and obesity. (*See* R. 75, 86, 308, 401, 479). On remand, the ALJ should consider all of Alvino's impairments. 20 C.F.R. 404.1545(a)(2).

## III.   CONCLUSION

For the foregoing reasons, the Commissioner's Motion for Summary Judgment [17] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion. The Clerk is directed to enter judgment in favor of Plaintiff and against Defendant Commissioner of Social Security.

**SO ORDERED.**

Dated:  April 14, 2020

Sunil R. Harjani
United States Magistrate Judge